Mary Ann **MAYWALT**, Mary White, John Vosefski and Vivienne Galligan, J. Richard Aboud DDS, Inc., Defined Benefit Pension Plan, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**PARKER & PARSLEY PETROLEUM COMPANY**, Smith Barney, Harris, Upham & Co., Inc., Barrie M. Damson, William T. Ouzts, Robert F. Carr, III, J. William Pierce, Robert S. Rose, Jerol M. Sonosky, Garth M. Ramsay, Scott D. Sheffield, Herbert C. Williamson, III, Timothy M. Dunn, James D. Moring, Robert J. Castor, A. Frank Kubica, Defendants.

No. 92 Civ. 1152 (RWS).

United States District Court,
S.D. New York.

Dec. 9, 1992.

Kaplan & Kilsheimer (Robert N. Kaplan, Richard J. Kilsheimer, of counsel), New York City, Sullivan, Hill, Lewin & Markham (David R. Markham, Michael A. LaBazzo, of counsel), San Diego, CA, Bradford & Decker (Donald R. Bradford, John Decker, of counsel), Tulsa, OK, for plaintiffs.

Stroock & Stroock & Lavan (Melvin A. Brosterman, of counsel), New York City, Johnson & Gibbs, P.C., Dallas, TX, for defendant Parker & Parsley Petroleum Co. Scott D. Sheffield, Herbert C. Williamson, III, Timothy M. Dunn, James D. Moring, Robert J. Castor, and A. Frank Kubica.

Akin, Gump, Hauer & Feld, L.L.P. (Michael P. Lynn, P.C., of counsel), Dallas, TX, Meister Leventhal & Slade (Jeffrey C. Slade, of counsel), New York City, for defendants Barrie M. Damson, William T. Ouzts, Robert F. Carr, III, J. William Pierce, Robert S. Rose, Jerol M. Sonosky and Garth M. Ramsey.

Cahill Gordon & Reindel (Charles A. Gilman, David G. Januszewski, of counsel), New York City, for defendant Smith Barney, Harris Upham & Co., Inc.

## OPINION

SWEET, District Judge.

This is an action brought by former investors in limited partnerships against the general partner, the subsequent company created through an exchange agreement which consolidated the Plaintiffs' limited partnerships with other limited partnerships, various individual officers and directors of the general partner and the new company, and the investment banking firm which prepared a fairness opinion regarding the transaction. The Plaintiffs allege claims pursuant to Sections 12(2) and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77a *et seq.;* Sections 10(b) (and Rule 10b–5) and 20 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78a *et seq.;* Section 14 (and Rules 14a–6, 14a–9) of the 1934 Act; and pendant state claims of breach of fiduciary duty, negligent misrepresentation, and common law fraud.

The various defendants have moved to dismiss this action pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., for failure to plead claims for relief, failure to plead fraud with sufficient particularity, and failure to plead sufficient state law claims. For the reasons set forth below, the Defen-

dants' motions are granted in part and denied in part.

*The Parties*

The Plaintiffs ("Damson Limited Partners") bring this action as individuals and as representatives of a purported class of investors[1] who formerly held limited partnership interests in one or more of five limited partnerships organized by the Damson Oil Corporation ("DOC") and in which DOC served as general partner. These partnerships (collectively, the "Damson Limited Partnerships") were Damson Energy Company, L.P. ("Damson Energy"), Damson Institutional Energy Limited Partnership ("Damson Institutional"), Damson Income Energy Limited Partnership ("Damson Income"), Damson 1983–84 Oil & Gas Income Fund–Series 1985–1 ("Damson 1985–1"), and Damson 1984–85 Institutional Oil & Gas Income Fund–Series 1985E–1 ("Damson 1985E–1").

Defendants Barrie M. Damson, William T. Ouzts, Robert F. Carr, III, J. William Pierce, Robert S. Rose, Jerol M. Sonosky, and Garth M. Ramsay were officers and directors of DOC ("DOC Defendants").

Parker & Parsley Petroleum Company ("PPPC") is the company formed by the consolidation of the Damson Limited Partnerships with certain partnerships and auxiliaries known as Parker & Parsley Development Partners L.P. ("Parsley & Parker Partnerships"), and it is the transaction culminating in the creation of PPPC that gave rise to the claims in this action. Officers and directors of PPPC named as individual defendants are Scott D. Sheffield, Herbert C. Williamson, III, Timothy M. Dunn, James D. Moring, Robert J. Castor, and A. Frank Kubica ("Individual Parker Defendants," and collectively with PPPC, "PPPC Defendants").

Defendant Smith Barney, Harris Upham & Co., Inc. ("Smith Barney"), a corporation incorporated under the laws of the State of Delaware, with its principal place of business in New York City, is an investment banking firm.

*Prior Proceedings*

The Plaintiffs filed their original Class Action Complaint on February 18, 1992 ("Original Complaint") and their First Amended Class Action Complaint ("Amended Complaint") on February 22, 1992. The action is brought by individual investors for themselves and on behalf of similarly situated members of a putative class, who were limited partners in the Damson Limited Partnerships organized by Defendant Barrie M. Damson, DOC's chairman, with DOC as the managing partner of each Partnership.

The present motions were filed by the PPPC Defendants on April 28, 1992, by the DOC Defendants on May 18, 1992, and by Smith Barney on June 2, 1992. Oral arguments were heard on July 1, 1992, and the motions were considered fully submitted as of that date.

*The Facts*[2]

Each of the Damson Limited Partnerships owned interests in oil and gas properties and gas processing plants. Approximately $1.4 billion was invested in the Damson Limited Partnerships by members of the asserted class between 1978 and 1985. The underlying basis of the Plaintiffs' action is a transaction ("Transaction") which was consummated on February 19, 1991 according to the terms and conditions of an exchange agreement ("Agreement") between DOC and Parker & Parsley Development Partners L.P. ("Parsley & Parker Partnerships").

Under the Agreement, the Damson Limited Partnerships would be merged with the Parker & Parsley Partnerships to create PPPC, and the managers of the Parker & Parsley Partnerships were to become officers and directors of PPPC and would control the merged entity, while members of DOC management were to resign and would be paid "severance" payments.

---

**1.** The class has yet to be certified.

**2.** As is discussed in detail below, on the face of a Rule 12(b)(6) motion to dismiss, a plaintiff's factual allegations are presumed to be true and all factual inferences are drawn in the plaintiff's favor. Therefore, the factual allegations set forth here do not constitute findings of fact by the Court.

The Agreement was subject to the approval and ratification by the Damson Limited Partners at a special meeting of limited partners ("Special Meeting") scheduled for February 19, 1991, in Dallas, Texas. In order to secure proxies from the Damson Limited Partners to approve the Agreement, PPPC, DOC, and the individual defendants sent the Damson Limited Partners a Prospectus/Proxy Statement ("Original Prospectus") that was issued on December 31, 1990. Attached to the Original Prospectus was a fairness opinion issued by Smith Barney, stating that the Transaction was "fair" to the Damson Limited Partners.

A Supplemental Prospectus ("First Supplement"), dated February 8, 1991, was filed with the Securities and Exchange Commission ("SEC") on February 11, 1991. Three days later, after a Damson investor filed suit in the Supreme Court of New York, alleging that the Agreement's severance payments to be made to DOC management constituted waste and breach of fiduciary duty, the Defendants and DOC filed a second Supplemental Prospectus ("Second Supplement") with the SEC on February 14, 1991.[3]

The Special Meeting of February 19 was held and Parker & Parsley voted the proxies obtained from the Damson Limited Partners, on the basis of the Original Prospectus and Smith Barney's fairness opinion, thereby consummating the Transaction according to the terms and conditions of the Agreement.

The assets of the Damson Limited Partnerships were consolidated with those of the Parsley & Parker Partnerships to form PPPC, and the stock of PPPC was distributed according to the exchange formula set forth in the Agreement. The end result of the ratification of the Agreement is asserted to be a direct financial loss to the Damson Limited Partners of more than $70 million.

The gravamen of the Plaintiffs' action is that, as a result of the fact that they received the First and Second Supplements either immediately before or after the Special Meeting,[4] PPPC, DOC, and their directors secured ratification of the Agreement by voting proxies which they had obtained pursuant to the disclosures of the Original Prospectus, and that the Defendants knew those disclosures to be inadequate, incomplete, and misleading.

*Discussion*

I. Legal Standards

 A. *Rule 12(b)(6)*

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiffs' favor and against the defendants. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from the Plaintiffs' Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.

Rule 12(b)(6) also imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *Accord Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (quoted in *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)).

█ In the event that a plaintiff alleges a claim based on a prospectus, as is the case here, the court may consider the pro-

---

**3.** The action in question is *Lindenauer v. Damson*, Index No. 5582/91, which is pending before the Supreme Court of New York, New York County.

**4.** It is also alleged that some Damson Limited Partners never received the Supplements.

spectus in ruling on a Rule 12(b)(6) motion even if the prospectus was not attached to the complaint and made a part thereof under Rule 10(c), Fed.R.Civ.P. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991).

■ Additionally, if the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint. *See Feick v. Fleener,* 653 F.2d 69, 75 & n. 4 (2d Cir. 1981); *United States ex rel. Sommer v. Dixon,* 524 F.Supp. 83, 85 (N.D.N.Y.1981), *aff'd,* 709 F.2d 173 (2d Cir.) (per curiam), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983). Following the logic of *Cortec* and *I. Meyer Pincus,* this rule also applies to a prospectus supplied by a defendant in support of its Rule 12(b)(6) motion to dismiss.

## B. *Rule 9(b)*

Rule 9(b), Fed.R.Civ.P., requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971) (Rule 9(b) applies to fraud claims under § 10(b) of the 1934 Act). The pleading must be sufficiently particular to serve the three goals of Rule 9(b):

(1) to provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits,

*Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 976 (E.D.N.Y.1988), *vacated in part, In re Crazy Eddie Sec. Litig.,* 714 F.Supp. 1285 (E.D.N.Y.1989) (citing *Di Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)).

---

**5.** The traditional elements of fraud are misrepresentation of a material fact, falsity of that representation, scienter, reliance, and damages.

■ Conclusory allegations of wrongdoing do not satisfy the requirements imposed by Rule 9(b). Rule 9(b) is satisfied in a fraud case only when the complaint sets forth

1) precisely what statements were made in what documents or oral representations or what omissions were made, ... 2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, 3) the content of such statements and the manner in which they misled, and 4) what the defendants "obtained as a consequence of the fraud."

*Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978). *See also Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1232 (S.D.N.Y.1981); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1149 (S.D.N.Y.1979); *Gross v. Diversified Mortg. Inv.,* 431 F.Supp. 1080, 1087 (S.D.N.Y.1977). In addition, the allegations of the complaint must at least give rise to an inference of fraud.[5] *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

■ The plaintiff's complaint must give notice to each defendant of its alleged misconduct.

[A] complaint, therefore, may not rely upon blanket references to acts or omissions by all of the "defendants," for each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.

*Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n. 7 (S.D.N.Y. 1977). This requirement facilitates the preparation of an adequate defense while protecting a defendant's reputation from groundless accusations. *See De Atucha v. Hunt,* 128 F.R.D. 187, 189 (S.D.N.Y.1989); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd without op.,* 697 F.2d 296 (2d Cir.1982). It also serves to prevent the abuse of process and the

---

*See Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

disruption of the gratuitous defendant's normal business activity. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975).

■ However, when the plaintiff is alleging corporate fraud perpetrated on investors through the use of "group-published information," such as prospectuses, registration statements, annual reports, and press releases, as the Plaintiffs are alleging here, "it is reasonable to presume that these are collective actions of the officers." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). Thus,

> [u]nder such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and when possible the roles of the individual defendants in the misrepresentations.

*Id.*

■ The Rule 9(b) standard also is relaxed when the defendant is an "insider" or an "affiliate." *See Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986); *Stevens v. Equidyne Extractive Indus. 1980, Petro/Coal Program 1*, 694 F.Supp. 1057, 1061 (S.D.N.Y.1988). But, as this Court has previously noted, this relaxed standard is to be distinguished from the stricter standards applicable to claims brought against professionals involved in the transaction. *See Ahmed v. Trupin*, 781 F.Supp. 1017, 1027 (S.D.N.Y.1992) (accountants and attorneys not treated as insiders); *Bruce v. Martin*, 691 F.Supp. 716, 724 (S.D.N.Y.1988) (aider and abettor defendants were alleged to be affiliates and insiders or controlled parties); *Stevens*, 694 F.Supp. at 1062 (accountants and attorney not insiders, "therefore the relaxed standards of pleading with respect to who said what do not apply"); *see also Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 531 (S.D.N.Y.1990) ("where counsel drafted the offering memorandum and were acting on behalf of the general partner, they are not,

without more, corporate insiders or affiliates to whom the relaxed pleadings standards are applicable"), *aff'd*, 927 F.2d 594 (2d Cir.1991).

### C. The Standard of "Materiality"

■ When a plaintiff alleges misrepresentations or omissions in a prospectus in violation of the provisions of the 1933 and 1934 Acts, the burden is on the plaintiff to demonstrate that those misrepresentations or omissions were *material* in nature. Thus, the plaintiff must make

> a showing of substantial likelihood that, under all the circumstances, the omitted [or misrepresented] fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted [or misrepresented] fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[6] *See also Basic, Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."). This "substantial likelihood" standard does not require the plaintiff to show that a reasonable investor would have changed his mind in the face of full disclosure. *See Basic, Inc.*, 485 U.S. at 231–32, 108 S.Ct. at 983; *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384–85, 90 S.Ct. 616, 621–22, 24 L.Ed.2d 593 (1970); *Feinberg Testamentary Trust v. Carter*, 652 F.Supp. 1066 (S.D.N.Y.1987); *see also Lebhar Friedman, Inc. v. Movielab, Inc.*, No. 86 Civ. 9965 (SWK), 1987 WL 5793, 1987 U.S.Dist. LEXIS 127, at *13 (S.D.N.Y. Jan. 13, 1987) (failure to disclose independent counsel's recommendations for board

---

6. The test for materiality is virtually the same under the anti-fraud provisions and affirmative disclosure requirements of Sections 12(2) of the 1933 Act and Sections 10(b) and 14(a) of the 1934 Act. *See J.I. Case Co. v. Borak*, 377 U.S.

426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Securities & Exch. Comm'n v. Texas Gulf Sulfur Co.*, 401 F.2d 833 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

action, including reevaluation of CEO's compensation, held to be material).

■ Because materiality is a mixed question of law and fact, *TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133, the materiality of an omitted or misrepresented fact is resolvable on a motion to dismiss only if the underlying facts are free of controversy and the fact is so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the "total mix" of information made available to the plaintiffs. *See Zell v. Intercapital Income Sec., Inc.*, 675 F.2d 1041, 1045 (9th Cir. 1982).

## II. The Factual Allegations

■ The allegations contained in the Amended Complaint regarding violations of §§ 12(2) and 15 of the 1933 Act and §§ 10(b), 14(a), and 20 of the 1934 Act are set forth with the requisite particularity with regard to each of the PPPC and DOC Defendants to survive the their Rule 12(b)(6) motions to dismiss. However, the allegations regarding Smith Barney's § 10(b) and Rule 10b–5 violations fail to pass muster under Rule 9(b) and are dismissed.

### A. *The Original Prospectus*

The Damson Limited Partners make the following allegations about the Defendants' false statements and omission of material facts in the Original Prospectus:

36. In order to obtain the approval and ratification of the Damson limited partners, P & P, DOC and the individual defendants prepared a Prospectus/Proxy Statement dated December 31, 1990. The Prospectus solicited proxies from Damson limited partners for approval of the Exchange Agreement. The Prospectus was over 215 pages long, not including hundreds of pages of attached exhibits. The Prospectus was also difficult to understand because financial information concerning the reserves and other assets contributed by the respective partnerships was not succinctly and clearly summarized. Nonetheless, the financial information set forth in the Prospectus

suggested that the value of the assets contributed by the Damson and Parker & Parsley partnerships were comparable.

37. In order to further induce the limited partners to execute proxies solicited by management for ratification of the Exchange Agreement, DOC obtained and appended to the P & P Prospectus a so-called "fairness opinion" issued by defendant Smith Barney.

Am.Compl. ¶¶ 36, 37. The fairness opinion stated it assumed the accuracy of all the information stated in the Original Prospectus, an assumption that proved to be incorrect.

### B. *Omissions of Material Facts*

The Damson Limited Partners made further allegations regarding omissions of material facts:

The December 31, 1990 Prospectus, did not reflect the year-end financial information compiled by the partnerships, which indicated that certain assets of the Damson Limited Partnerships, specifically the gas treatment plants, had been undervalued by more than $100 million in the Original Prospectus. Additionally, by at least mid-January 1991, DOC and P & P management were aware that the Damson partnerships were contributing approximately 60% of the total asset values contributed to the newly formed merger corporation in exchange for only 40% of P & P stock to be issued after the agreement was ratified (after adjustment for the cash to be paid to the Damson limited partners under the Exchange Agreement). This meant that the Damson partners were being shortchanged by an amount in excess of $70 million under the Exchange Agreement. The Original Prospectus also did not adequately account for the Damson partnership reserve insurance.

... By mid-January 1991, P & P and the Damson Director Defendants knew that DOC itself would not agree to the same exchange formula it had negotiated for its limited partners under the Exchange Agreement. Specifically, certain DOC security holders refused to approve the Exchange Agreement because the com-

pensation it provided was unfair and inadequate even though DOC and the Damson Director Defendants were soliciting proxies from the Damson limited partners to approve the same exchange formula....

*Id.* at ¶¶ 39, 40.

### C. *The First and Second Supplements*

The Amended Complaint contained the following allegations regarding the defects of the First Supplements and the Defendants' decision not to postpone the Special Meeting:

Recognizing that the financial information in the December 31, 1990 Prospectus was insufficient, incomplete and misleading, and knowing DOC itself would not agree to the adequacy of the compensation paid for its own interest in the Damson Limited Partnerships, P & P and DOC management and the individual defendants prepared a first "Supplemental Prospectus/Proxy Statement," nominally dated February 8, 1991.

... It ... specifically showed among other things, (1) an increase in the value of the Damson Limited Partnership gas treatment plants of $110 million, and (2) that certain DOC security holders would not agree to the exchange formula specified in the Exchange Agreement. Because the first Supplemental Prospectus contained material revisions of the information set forth in the Original Prospectus, DOC and P & P were required to wait at least 10 days after filing the Supplemental Prospectus with the SEC before distributing it to the Damson limited partners under Reg. § 240.14a–6(a), n. 1.... This ten day period would have expired February 21, 1991, two days after the special partners' meeting. P & P and DOC choose not to postpone the meeting and failed to comply with this waiting period, in violation of this regulation. Moreover, they mailed the Supplemental Prospectus so that it would not be received in sufficient time before the special meeting.

*Id.* at ¶ 41.

The Amended Complaint continues with allegations regarding the defects of the Second Supplement and the Defendants' distribution of it:

On February 14, 1991, P & P and DOC filed a second Supplemental Prospectus/Proxy Statement with the SEC which identified a lawsuit filed by a limited partner complaining of the cash payments made to Damson management. Many limited partners, including those who held their partnership units in street name, did not receive the second Supplemental Prospectus until after the February 19, 1991 partners' meeting, if at all. Those who did receive the first Supplemental Prospectus before the special meeting did so only one or two business days before the meeting and were unable to review the material and either revoke their previously given proxies under the procedures specified in the original December 31, 1990 solicitation materials or to otherwise express a negative vote on ratification of the Exchange Transaction.

*Id.*

### D. *Allegations of Scienter*

Finally, with regard to the Defendants' intentional misconduct at the Special Meeting, the Damson Limited Partners allege that

[v]oting their own units as well as proxies solicited on the strength of the Original Prospectus which they knew to be incomplete and misleading, defendants were able to obtain approval and ratification of the Exchange Agreement at the partners' meeting of February 19, 1991. As alleged above, DOC later negotiated a transfer of its interests in the Damson Limited Partnerships for consideration at a value approximately 80% greater than that received by the Damson limited partners.

*Id.* at ¶ 42.

If all factual inferences are drawn in favor of the Plaintiffs, it can be concluded that the allegations set forth in their Amended Complaint are reasonably inferred from the Original Prospectus, the First and Second Supplements, and the events transpiring at the Special Meeting. The misstatements and omissions of mate-

rial facts are alleged with sufficient particularity.

The Amended Complaint alleges that each of the Defendants was an essential participant in making the statements in the Original Prospectus, in failing to postpone the Special Meeting, in failing to modify or withdraw Smith Barney's fairness opinion, and in voting the proxies obtained in reliance on the Original Prospectus.[7] It follows, that the role of each of the Defendants is explicitly alleged in the Amended Complaint.

III. The § 10(b) and Rule 10b–5 Allegations Against the DOC and PPPC Defendants

A. *Adequate § 10(b) and Rule 10b–5 Allegations*

Rule 10b–5, promulgated under the authority of § 10(b) of the 1934 Act, makes it unlawful for anyone

directly or indirectly, . . .

(1) to employ any device, scheme, or artifice, to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

■ The pleading requirements of Rule 9(b) apply to allegations of Rule 10b–5 fraud. *See Basic, Inc.,* 485 U.S. at 231–232, 108 S.Ct. at 983. In their Amended Complaint, the Damson Limited Partners allege a general fraudulent scheme against all of the Defendants and, therefore, have an obligation "to allege specifically the fraud perpetrated by each defendant." *Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1982). *See also Securities and Exch. Comm'n v. Cable/Tel Corp.,* 90 F.R.D. 662, 664 (S.D.N.Y.1981); *Goldberg*

*v. Meridor,* 81 F.R.D. 105, 111 (S.D.N.Y. 1979).

■ Additionally, a plaintiff asserting a § 10(b) claim must file the action in a timely manner in compliance with the statute of limitations imposed by *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). In *Lampf,* the Supreme Court held that private actions under § 10(b) must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation. *See* — U.S. at ——, 111 S.Ct. at 2781–82. And, to adequately plead § 10(b) violations, the plaintiff must aver compliance with the one year/three year statute of limitations. *See Jacobson,* 445 F.Supp. at 525–26.

B. *The § 10(b) and Rule 10b– 5 Actions are Timely*

■ The Defendants contend that the Plaintiffs failed affirmatively to demonstrate compliance with the relevant statute of limitations period in bringing this private action pursuant to § 10(b) and Rule 10b–5. The question turns on whether the Plaintiffs commenced this action within one year of the time that they knew or should have known of the § 10(b) violations they now allege. *See Phillips v. Levie,* 593 F.2d 459, 462 (2d Cir.1979); *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977); *Kronfeld v. Advest, Inc.,* 675 F.Supp. 1449, 1458 (S.D.N.Y.1987). The Defendants assert that the Plaintiffs' allegations are based on information contained in the First and Second Supplements, which were dated February 8, 1991 and February 12, 1991, respectively. In their view, February 12, 1991 is the triggering date of the one-year statute of limitations. It follows from this premise that the action is untimely, because the statute of limitations had already lapsed when the Original Complaint was filed on February 18, 1992.

The Defendants, however, misidentify the triggering event which occurred at the Special Meeting on February 19, 1991. The

---

**7.** For the reasons set forth below, this conclu-

sion does not apply to Smith Barney.

quintessential acts in the allegedly fraudulent scheme were the ratification of the Agreement and consummation of the Transaction by voting the proxies based on the materially defective Original Prospectus at the Special Meeting. Had the special meeting been adjourned to a later date, thereby giving the Damson Limited Partners sufficient time to respond to the First and Second Supplements, the defects of the Original Prospectus could have been cured.

The Defendants correctly note that the critical element for the statute of limitations governing § 10(b) and Rule 10b–5 claims is the *discovery* of the facts upon which the allegations are based not the consummation of the merger. However, in this case, the two are one and the same because it is only with the events surrounding the consummation of the merger that the factual conditions were created which now give rise to the Damson Limited Partners' allegations. It was only upon receiving information about the defects in the Original Prospectus combined with the voting of the proxies and the consummation of the merger that the Damson Limited Partners knew or could have known of the violations of § 10(b) that they are now alleging. Therefore, the Complaint was timely filed under *Lampf.*

The allegations set forth in both the Original Complaint and the Amended Complaint also sufficiently allege compliance with the statute of limitations because they explicitly set forth the critical dates on which the Damson Limited Partners knew or could have known about the violations they now allege.[8]

### C. *The Circumstances of Fraud are Adequately Pleaded*

 The Damson Limited Partners have pleaded the circumstances of fraud with sufficient particularity regarding the time, place, and content of the alleged misrepresentations made in Original Prospectus and the events culminating in the ratification of the Agreement and the consummation of the Transaction. Paragraphs 36 and 37 of the Amended Complaint refer to

the inclusion in the Original Prospectus of the Smith Barney fairness opinion. It is asserted that this opinion was used to solicit the Damson Limited Partners' proxies or to cause them not to oppose the Agreement. The allegedly false information was the representation of fairness in the value the Damson Limited Partners were to receive for their interests in the Damson Limited Partnerships.

The subsequent Supplements disclosed the material defects in the Original Prospectus. The First Supplement revealed that the Damson Limited Partnerships' gas treatment plants had been undervalued by $100 million, and that DOC's shares would not be voted in favor of the Agreement because certain DOC security holders would not agree to the exchange formula specified in the Agreement. The Second Supplement revealed that litigation had been commenced on a claim of self-dealing and waste by the promoters of the transaction.

However, neither Supplement indicated that the Special Meeting would be adjourned in light of these new material facts, and, in fact, the Special Meeting was held as originally scheduled on February 19, 1991, despite the late date on which the Supplements were mailed to the Damson Limited Partners. It was at this meeting that the proxies solicited pursuant to the materially defective Original Prospectus were voted and the Agreement ratified.

 Furthermore, the Damson Limited Partners have satisfied the *TSC Industries* standard of materiality by alleging misrepresentations and omissions of facts in the Original Prospectus that were not so obviously unimportant that no reasonable shareholder could have viewed them as significantly altering the "total mix" of the information made available to them in that document. *See Zell,* 675 F.2d at 1045.

### D. *Aider and Abettor Liability is Adequately Pleaded*

 To establish aider and abettor liability under Rule 10b–5, a plaintiff must

---

**8.** Note that February 19, 1991, the date of the Special Meeting, is the earliest date by which the Damson Limited Partners could have known of the alleged fraud.

plead and prove: (1) a securities violation by a primary party; 2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of that primary violation. *See Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *Ahmed,* 781 F.Supp. at 1021; *Reingold v. Deloitte Haskins & Sells,* 599 F.Supp. 1241, 1269 (S.D.N.Y.1984). Each element must be stated with particularity, including "substantial assistance of the primary fraud." *Morgan v. Prudential Group, Inc.,* 81 F.R.D. 418, 425 (S.D.N.Y.1978).

■ In the matter at hand, the Amended Complaint alleges violations by PPPC, the issuer under the Agreement, for material misstatements and omissions in the Original Prospectus, and by DOC, the solicitor of the proxies of the Damson Limited Partners. The Amended Complaint further alleges that the individual defendants, by reason of the amendments in the Supplements had knowledge as of the date of the Special Meeting that there were misstatements and omissions in the Original Prospectus upon which the Damson Limited Partners relied in exercising their voting rights on the Agreement.

The Amended Complaint further alleges that the Defendants rendered substantial assistance by going forward to close the Transaction, without any postponement of the Special Meeting for the voting of the Damson Limited Partners' proxies. Therefore, the allegations of aider and abettor liability against the individual DOC and PPPC Defendants are stated with the requisite particularity to withstand the Defendants' Rule 12(b)(6) motion to dismiss.

### E. *Scienter is Adequately Pleaded*

■ The allegations set forth in the Amended Complaint regarding the Defendants' failure to postpone the Special Meeting for approval of the Agreement and voting the Damson Limited Partners' proxies after it was determined that the Supplements were necessary to correct misrepresentations and omissions in the Original Prospectus are sufficient to survive the Defendants' motions to dismiss.

### F. *Conclusion*

When these various elements of the Amended Complaint are taken together, it follows that the Rule 12(b)(6) motions of the DOC Defendants and PPPC Defendants to dismiss the Damson Limited Partners' Third and Fourth Claims for Relief must be denied.

### IV. The § 12(2) Allegations Against the DOC and PPPC Defendants

Section 12(2) of the 1933 Act makes any person who

> offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading ...,
>
> ... liable to the person purchasing such security from him, who may sue either ... to recover the consideration paid for such security ..., or for money damages if he no longer owns the security.

■ Just as claims brought pursuant to § 10 and Rule 10b–5, § 12(2) claims based on fraud must comply with the pleading requirements of Rule 9(b). *See Drexel Burnham Lambert Group, Inc. v. Microgenesys, Inc.,* 775 F.Supp. 660, 666 (S.D.N.Y.1991); *Hershey v. MNC Fin., Inc.,* 774 F.Supp. 367, 375 (D.Md.1991).

■ Section 13 of the 1933 Act imposes a one year/three year statute of limitations on private actions for § 12(2) actions, and because compliance with § 13 is an essential element of a § 12(2) claim, a complaint asserting this claim must explicitly aver such compliance. *See Morin v. Trupin,* 747 F.Supp. 1051, 1063 (S.D.N.Y.1990); *Bresson v. Thomson McKinnon Sec., Inc.,* 641 F.Supp. 338, 343 (S.D.N.Y.1986).

Finally, the liability imposed by § 12(2) is limited to *sellers* of securities and thus imposes a strict privity requirement on those who may be parties to a 12(2) action. The Supreme Court has held that a person may be liable as a seller of securities if that person is "the owner who passed title, or

other interest in the security, to the buyer for value," or "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 108 S.Ct. 2063, 2076, 2078–79, 100 L.Ed.2d 658 (1988).

■ The claims brought pursuant to § 12(2) incorporate by reference the various factual allegations discussed above. Therefore, for the reasons stated with respect to the § 10(b) and Rule 10b–5 claims, the Amended Complaint satisfies the Rule 9(b) requirements applicable to these claims and the § 12(2) claims withstand the Defendants' Rule 12(b)(6) motion to dismiss these claims.

■ Also, for the reasons stated above with respect to the timeliness of the § 10(b) and Rule 10b–5 claims and the sufficiency of the complaint to aver compliance with the statute of limitations, the Plaintiffs' claims regarding violations of § 12(2) are timely and the complaint sufficiently avers compliance with the statute of limitations.

■ The final issue is that of identifying the "sellers" in the Transaction for § 12(2) purposes. Here, PPPC was the issuer of its stock which was distributed to the Damson Limited Partners in accordance with the Agreement. As the issuer of new shares to the investors, PPPC directly transferred titled and, therefore, qualifies as a seller under *Pinter*.

Where, as here, the solicitation of the Damson Limited Partners' proxies was through a group-published document and the individual Defendants were the managers of the consolidated partnerships and ended up as directors and officers of the resulting company, these alleged facts support a strong inference that the directors conducted and controlled the solicitation. *See Wool*, 818 F.2d at 1440.

■ The Parker & Parsley officers and directors named as individual Defendants are asserted to have been members of the managing committee of the general partner of the Parker & Parsley Partnerships. According to the Original Prospectus, that entity recommended approval of the Transaction. Thus, a sufficient claim has been made that they are liable for the solicitation of the proxies under § 12(2).

■ As revealed in the proxy statement, the DOC Defendants were the directors of DOC which conducted the solicitation. Additionally, the Original Prospectus contained the recommendation of the DOC Board of Directors that the Damson Limited Partners approve the transaction. The facts alleged regarding this solicitation state a sufficient claim under § 12(2). Therefore, the PPPC and DOC Defendants' motions to dismiss the Plaintiffs' § 12(2) claims are denied.

## V. The §§ 15 and 20 Allegations Against the DOC and PPPC Defendants

Section 15 of the 1933 Act defines the liability of controlling persons as follows:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person. . . .

Section 20 of the 1934 Act imposes comparable liability on controlling persons for violations of that Act committed by a controlled person. *See Securities & Exch. Comm'n v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975).

■ Controlling person liability is derivative and cannot exist in the absence of a primary violation of the Acts. *See In re First Chicago Corp. Sec. Litig.*, 769 F.Supp. 1444, 1455–56 n. 7 (N.D.Ill.1991); *Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1133 (D.R.I.1991). To attach controlling person liability, a plaintiff must demonstrate that:

> (1) the alleged control person actively participated in the overall management and operation of the alleged controlled entity; and (2) that such control person

actively participated in the fraud allegedly perpetrated by that entity. *Northwestern Nat'l Ins. Co. v. Alberts,* 769 F.Supp. 498, 509 (S.D.N.Y.1991) (citing *Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 478 (W.D.N.Y.1987)).

Additionally, "[a] person's status as an officer, director or shareholder, absent more, is not enough to trigger liability under Section 20." *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y.1988). "However, where ... the corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violations." *Wool,* 818 F.2d at 1441. *See also Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262, 266 (S.D.N.Y.1988).

**A. The Individual PPPC Defendants and DOC Defendants Had Control**

In the matter at hand, the Plaintiffs allege that the Individual PPPC Defendants were the managers of the Parker & Parsley Partnerships who, under the terms of the Agreement, garnered for themselves positions as officers and directors of the surviving entity, PPPC. It is also alleged that the DOC Defendants obtained for themselves generous "golden parachute" severance payments, which they would not have received had they not held and exercised control over DOC and the Damson Limited Partnerships in the Transaction.

Absent discovery, the Plaintiffs have no opportunity to determine precisely how the Parker & Parsley officers, as Parker & Parsley Partnership managers, and the DOC Defendants divided responsibility among themselves for the preparation of the Original Prospectus and the First and Second Supplements. *See Leavey v. Blinder, Robinson & Co.,* [1986–1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,996 at 94,884, 1986 WL 10556 (E.D.Pa. Sept. 18, 1986) ("Plaintiffs' complaint could be more specific only if they surreptitiously attended corporate board meetings or somehow obtained internal corporate communications."); *see also Bruce,* 691 F.Supp. at 724

(recognizing that Rule 9(b) is relaxed when assessing claims against the insiders of principals in a challenged fraudulent scheme).

**B. The Individual PPPC and DOC Defendants Actively Participated in the Scheme**

■■■■■■ A presumption of control applies to "group-published statements" such as prospectuses, registration statements, and proxy statements so that they are treated as collective actions of the corporate officers. *See Wool,* 818 F.2d at 1441. When the alleged fraud is perpetrated through such a group-published statement, a plaintiff alleges culpable participation by pleading the misrepresentations with particularity and where possible with respect to the individual defendants. *See id.* at 1442; *see also Metzner,* 689 F.Supp. at 266.

"[D]irectors 'who fall within (t)he definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons' are liable." *Mabon, Nugent & Co. v. Borey,* 127 B.R. 727, 740 (S.D.N.Y.1991) (quoting *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973)).

■■■■ In the matter at hand, the Damson Limited Partners allege that the Individual PPPC Defendants, who previously were the managers of the Parker & Parsley Partnerships and who became the officers and directors of PPPC as a result of the Transaction, were culpable participants at least as a result of their failure to postpone the Special Meeting. This allegation is also made with regard to the DOC Defendants, insofar as their control is evidenced by their ability to negotiate "golden parachutes" for themselves as part of the Agreement. Therefore, the conduct of these Defendants alleged by the Plaintiffs is sufficient to state claims pursuant to §§ 15 and 20 and withstand these motions to dismiss, which are, accordingly, denied.

**VI. The § 14(a) Allegations Against the DOC and PPPC Defendants**

**A. Adequate § 14(a) Allegations**

Section 14(a) of the 1934 Act regulates securities registered under § 12 of that Act and

was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.

*Mills,* 396 U.S. at 381, 90 S.Ct. at 620.

Rule 14a–6(a) requires that an original prospectus and proxy statement be filed with the SEC

at least 10 calendar days prior to the date definitive copies of such material are first sent or given to security holders, or such shorter period as the Commission may authorize upon a showing of good cause thereunder.

Rule 14a–6(b) requires that preliminary additional materials be filed at least two business days before the definitive copies are sent to security holders.

Rule 14a–9 proscribes the solicitation of proxies which contain any materially false or misleading statements, or which omit to state any material facts necessary to make statements in the solicitation neither false nor misleading.

■ The Supreme Court has recognized an implied private right of action under § 14(a) and Rule 14a–9, *see Borak,* 377 U.S. at 426, 84 S.Ct. at 1555, and the standards of Rule 9(b) apply to the pleading of Rule 14a–9 claims. *See Goldman v. Lexington Ave. & 42nd St. Corp.,* No. 84 Civ. 5341 (CSH), 1987 WL 8340, at *3, 1987 U.S.Dist. LEXIS 1912, at *11 (S.D.N.Y. Mar. 18, 1987); *Brayton v. Ostrau,* 561 F.Supp. 156, 163 (S.D.N.Y.1983); *Lewis v. Valley,* 476 F.Supp. 62, 65 (S.D.N.Y.1979). Furthermore, the Rule 14a–9 remedy continues to be broad in scope in light of the Second Circuit's upholding private 14a–9 claims alleging negligence rather than scienter. *See Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1300–01 (2d Cir.1973).

### B. An Implied Private Right of Action for 14a–6 Violations

■ The Defendants contend that the Damson Limited Partners have failed to state a claim under § 14(a) of the 1934 Act because, while there is an implied private right of action for a breach of § 14(a) as implemented by Rule 14a–9, "[t]his implied private right of action has not ... been extended to alleged breaches of § 14(a) as implemented by Rule 14a–6." PPPC Mem. 23. Additionally, they point to the Supreme Court's disinclination to expand implied rights action as recently stated in *Virginia Bankshares, Inc. v. Sandberg,* — U.S. ——, ——, 111 S.Ct. 2749, 2763, 115 L.Ed.2d 929 (1991).

The Plaintiffs rely on *Lynch v. Fulks,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,831 (D.Kan. Dec. 12, 1980), for the proposition that there is a cognizable implied right of action for a violation of Rule 14a–6. In *Lynch,* the court noted that the Supreme Court in *Borak* upheld a complaint seeking damages resulting from the consummation of a merger which was authorized pursuant to a proxy statement alleged to contain false and misleading statements in violation of § 14(a).[9] From this premise, the *Lynch* court reasoned that it would be absurd to conclude that Congress intended to imply a cause of action for damages pursuant to Rule 14a–9 but not pursuant to Rule 14a–6, when no rule in the Section had been adopted when the statute was enacted.

While this Court is reluctant to recognize new implied private rights of action under the 1933 and 1934 Acts, the reasoning in *Lynch* is persuasive when applied to the allegations raised in the matter at hand. The Defendants' claim that an implied private right of action should not be recognized for the mere failure to comply with the filing requirements of Rule 14a–6 is valid. However, the allegations raised by the Plaintiffs goes well beyond a mere filing violation. Rather, the violation alleged

9. In *Borak,* the Supreme Court held, "[t]he purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." 377 U.S. at 431, 84 S.Ct. at 1559. The Court concluded that "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission actions." *Id.* at 432, 84 S.Ct. at 1560.

here is precisely that which Congress intended to address through § 14(a), and which the Supreme Court intended to address by recognizing the implied private right of action for violations of Rule 14a–9.

Subsections (a) and (b) of Rule 14a–6 address the issue of the timing between the filing of original and supplemental proxy statements with the SEC and the distribution of definitive copies of the statements to the stockholders. Even if the Defendants technically may have complied with these timing requirements, the allegations levelled in the Amended Complaint assert the violation of the single overarching concern of § 14(a), to wit, the promotion of the free and informed exercise of the stockholder's voting rights. through proxies. *See Mills,* 396 U.S. at 381, 90 S.Ct. at 620.

When a fraud is intentionally perpetrated on investors by timing the filing and distribution of corrected proxy statements in such a way that they cannot be distributed to the investors before a special meeting at which the proxies solicited on the basis of a defective proxy statement are voted, the solicitation cannot be cured or liability avoided simply by asserting compliance with Rule 14a–6.

Therefore, there is an implied private right of action for a violation of Rule 14a–6 when the Rule 14a–6 violation is asserted in concert with a general Rule 14(a) violation regarding the solicitation *and voting* of proxies based on a proxy statement containing material misrepresentations or omissions that were not effectively cured

by a supplemental proxy statement which did, in fact, contain material revisions of the original statement, but which was issued and the solicited proxies voted before the statutory waiting period had expired.

This holding is consistent with the Note 1 to Rule 14a–6(a) and the explanation of the note set forth in SEC Release 34–23789. Note 1 states that "[t]he filing of revised material does not recommence the ten day time period unless the revised material contains material revisions ... that constitute a fundamental change in the proxy material." [10] 17 C.F.R. § 240.14a–6(a). Release 34–23789 explicates this note as follows:

> When there have been material changes in the proxy soliciting material or material subsequent events (in contrast to routine updating), an additional proxy card, along with revised or additional proxy solicitation material, should be furnished to security holders. A sufficient period of time should be allowed for adequate dissemination of the material information to security holders prior to the meeting of security holders or the date on which the consents or authorizations may be used to effect the proposed action to permit security holders to assess the information and to change their voting decisions if desired.

Sec.Exch. Act of 1934, Release No. 34–23789, 1986 SEC LEXIS 404, *15–*16 (Nov. 10, 1986) (footnotes omitted).

The Damson Limited Partners allege in their Amended Complaint a pattern of activity by the PPPC and DOC Defendants

**10.** Note 1 formalizes as part of a separate rule the antifraud principle developed earlier in actions brought pursuant to Rule 14a–9. The Second Circuit noted:

> We cannot suppose that management can lawfully sit by and allow shareholders to approve corporate action on the basis of a proxy statement without disclosing facts arising since its dissemination if these are so significant as to make it materially misleading, and we have no doubt that Rule 14a–9 is broad enough to impose liability for non-disclosure in this situation. Although we recognize the practical difficulties, the answer may be that a corporation ... must forego a merger until an ongoing program significantly affecting the value of its stock has been either accomplished of abandoned.

*Gerstle,* 478 F.2d at 1297 n. 15 (footnotes omitted). *See also In re Anderson, Clayton Shareholders' Litig.,* 519 A.2d 669, 675 (Del.Ch.1986) (solicitation period of three days not sufficient to allow security holders a reasonable opportunity to receive and consider additional soliciting material prior to the meeting); *Smith v. Van Gorkom,* 488 A.2d 858, 893 (Del.1985) ("in an appropriate case, an otherwise candid proxy statement may be so untimely as to defeat its purpose of meeting the needs of a fully informed electorate"). Both *Anderson, Clayton* (*sub nom., Bear, Stearns & Co. v. Anderson Clayton & Co.*) and *Van Gorkom* are cited by the SEC in Release 34–23789, adopting Note 1 to Rule 14a–6, indicating its proper application.

that violated both Rule 14a–6 and § 14(a) by voting proxies that were solicited by a proxy statement containing material misrepresentations and omissions of material facts. Thus, they qualify to bring an action under this Rule, and the allegations set forth in the Amended Complaint satisfy the particularity requirement of Rule 9(b).

### C. The Rule 14a–9 Allegations

■ When a proxy statement containing material misstatements and omitting material facts is distributed to investors for the purpose of seeking approval of a merger, and is followed by a purportedly curative amendment mailed so late that the persons entitled to vote do not receive it in time to affect their vote, a claim is stated pursuant to Rule 14a–9 and § 14(a). In *Bradshaw v. Jenkins*, [1983–1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,719 (W.D.Wash. Mar. 9, 1984), the court considered the application of Rule 14a–9 to a Rule 12(b)(6) motion to dismiss when the complaint alleged the solicitation of proxies for approval of a merger proposal pursuant to a materially defective proxy statement. The defective statement was followed by a subsequent amendment mailed to the shareholders six days before the special shareholders' meeting. The court denied the Rule 12(b)(6) motion on the ground that the plaintiff must be given a chance to prove its claim that the supplemental proxy statement was mailed too late to reach a large number of shareholders in time to affect their vote on the merger. *See Bradshaw*, ¶ 99,719 at 97,908 ("At this stage of the proceedings, the court cannot say as a matter of law that the supplemental proxy statement was distributed early enough to allow shareholders a meaningful opportunity to make an informed decision based upon its contents.").

■ In ¶ 41 of their Amended Complaint, the Damson Limited Partners allege facts similar to those alleged in *Bradshaw* regarding the mailing of the First and Second Supplements immediately before the Special Meeting; and as was the case in *Bradshaw,* such facts are sufficient to allege a violation of Rule 14a–9. Therefore, the Amended Complaint alleges violations of § 14(a) that are statutorily sound and adequately pleaded, and the Defendants' motions to dismiss these claims are denied.

### VII. The Rule 10b–5 Allegations Against Smith Barney Are Inadequate

The two critical allegations made by the Damson Limited Partners against Smith Barney to support their Rule 10b–5 claim are that the fairness opinion issued by Smith Barney and made a part of the Original Prospectus "did not adequately disclose that Smith Barney's compensation was contingent upon the approval of the Exchange Agreement by the limited partners," Am. Compl. ¶ 37; and "Smith Barney ... allowed its opinion to remain unmodified, despite the revaluation of the gas treatment plants by more than $100 million and the other material changes in the financial information," *id.* at ¶ 55.

■ Contrary to the first allegation, Smith Barney unambiguously and adequately disclosed all details concerning Smith Barney's compensation, including the contingent payment in the Original Prospectus. The Original Prospectus explained the compensation provided to Smith Barney for previous advisory financial services and disclosed that it had been retained effective December 1989 "to act as financial advisor to the DOC Independent Directors on behalf of the Damson Voting Partnerships" in return for which

> DOC and the Damson Voting Partnerships agreed to pay Smith Barney a transaction fee equal to 1% of the transaction value (as defined) of any such business combination concluded within six months.... No fee would be payable if a business combination were not consummated.

Original Prospectus 91. The fact that this disclosure came at page 91 of the 214–page Prospectus does not adversely affect the adequacy of the disclosure. Smith Barney is correct in characterizing the Plaintiffs' objection that the disclosure was "[b]uried on page 91 of the Prospectus," Am.Compl. ¶ 37, as "a contention that the Prospectus disclosed too much information, *i.e.,* that it

was too long." Smith Barney Mem. 9–10. *See Spielman v. General Host Corp.*, 402 F.Supp. 190, 205 (S.D.N.Y.1975) (" 'difficult decisions must be made as to what information to place toward the beginning and what to place further toward the end (of the document), what to emphasize and what to state more blandly. It is, of course, impossible to emphasize everything, and every fact can not be contained at the beginning.' "), *aff'd*, 538 F.2d 39 (2d Cir.1976) (per curiam).

■ The second prong of the Damson Limited Partners' Rule 10b–5 claim against Smith Barney is that Smith Barney allowed its opinion to remain unmodified despite the changes made in the First and Second Supplements. However, the Amended Complaint fails to assert that Smith Barney had knowledge of the information subsequently disclosed in the Supplements at the time that it issued its fairness opinion. In fact, the allegations of the Amended Complaint concede that if Smith Barney came to have knowledge of this information at all, it was only after the fairness opinion was issued.[11]

The Damson Limited Partners cannot rely on post-December 31, 1990 developments to support their Rule 10b–5 claim against Smith Barney because Smith Barney explicitly stated that "[o]ur opinion is based upon circumstances existing as of the date hereof." Original Prospectus G–1. The Original Prospectus also disclosed that Smith Barney's fairness opinion was "as of" the date of the Prospectus. *Id.* at 89.

Furthermore, Smith Barney did not make any representations concerning the valuation of the Damson Limited Partnership assets. The fairness opinion and the Prospectus stated that the principals involved in the transaction, not Smith Barney, were responsible for providing the asset valuations.

Thus, the Plaintiffs' Rule 10b–5 claim against Smith Barney cannot withstand this Rule 12(b)(6) motion to dismiss, and the motion is granted.[12]

## VIII. State Law Claims

The Damson Limited Partners assert three pendant state common law claims against the Defendants: breach of fiduciary duty, negligent misrepresentation, and common law fraud. The sufficiency of each of these claims is considered in turn.

### A. Breach of Fiduciary Duty

#### 1. *The DOC Defendants*

The Sixth Claim for Relief in the Amended Complaint asserts a claim for breach of fiduciary duty against the DOC Defendants. This claim goes beyond the Defendants' characterization of it as merely alleging waste and mismanagement by the DOC Defendants. The underlying allegations assert the deliberate, reckless, and/or negligent issuance of the materially defective Original Prospectus and the voting of the ill-gotten proxies to ratify the Agreement under which the DOC Defendants benefitted at the direct expense of the Plaintiffs. The harm alleged was not harm to partnerships, but to the Damson Limited Partners themselves. Thus, the claims being asserted are of a direct and not derivative nature.

■ The DOC Defendants contend that this claim must be dismissed because the duty implied in the Amended Complaint is not recognized in the relevant jurisdictions, and because the Damson Limited Partners have no standing to assert a class action on this claim. However, the class action is appropriate in this instance because the claims asserted are direct and not derivative. *See Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del.1988). This leaves only the question of the legal cognizability of the claim to be decided.

---

**11.** No explicit allegation is made that Smith Barney ever learned of the information subsequently set forth in the First and Second Supplements.

**12.** This is the only violation of either the 1933 or 1934 Act clearly pleaded by the Plaintiffs

against Smith Barney. Smith Barney is mentioned only in passing reference in allegations made against other Defendants. Therefore, Smith Barney's motion to dismiss this and the other securities claims impliedly asserted against it is granted.

■ The law of the state in which an entity is formed or incorporated governs the nature and extent of that entity's fiduciary obligations and liability for violations of the law. *See Zimmerman v. Prime Medical Servs., Inc.,* 729 F.Supp. 23, 26 (S.D.N.Y.1990); *Caballero v. Anselmo,* 720 F.Supp. 1088, 1098 (S.D.N.Y.1989); *Strain v. Seven Hill Assocs.,* 75 A.D.2d 360, 429 N.Y.S.2d 424, 426 (1st Dep't 1980). Damson Energy, Damson Income, and Damson Institutional were Texas limited partnerships. Damson 1985–1 and Damson 1985E–1 were Pennsylvania limited partnerships. Thus, Texas and Pennsylvania law, respectively, controls these state law claims.

■ Under Texas law, a fiduciary relationship generally exists only between the general partner and the limited partners. *See Crenshaw v. Swenson,* 611 S.W.2d 886, 890 (Tex.App.—Austin 1980, writ ref'd n.r.e.). This fiduciary relationship creates a right for a limited partner to bring an action only against the general partner, not the officers and directors of the general partner. *See* Tex.Rev.Civ.Stat. Ann. art. 6132a–1, Article 10. The one exception to this general rule arises when the actions of a shareholder of the general partner are such that it is appropriate to "pierce the partnership veil" to hold him personally liable to the limited partners. *See Remenchik v. Whittington,* 757 S.W.2d 836, 839 (Tex.App.—Houston 1988, no writ); *see also Curley v. Brignoli Curley & Roberts Assocs.,* 746 F.Supp. 1208 (S.D.N.Y.1989); *Tobias v. First Nat'l Bank & Trust Co.,* 709 F.Supp. 1266 (S.D.N.Y. 1989); *In re USACafes, L.P. Litig.,* 600 A.2d 43 (Del.Ch.1991).

■ The Amended Complaint alleges behavior on the part of the DOC Defendants which parallels that of corporate officers whose actions justify piercing the corporate veil. Thus, under Texas law, the Damson Limited Partners who owned investment units in Damson Energy, Damson Income, and Damson Institutional have stated a valid cause of action for breach of fiduciary duty against the individual DOC Defendants.

■ Pennsylvania law recognizes a fiduciary relationship between general partners and limited partners. *See* Pa.Con. Stat.Ann. tit. 15, § 8591; *Clement v. Clement,* 436 Pa. 466, 260 A.2d 728, 729 (1970). However, unlike the exception recognized by the Texas courts, the Pennsylvania Supreme Court has refused to pierce the partnership veil and find the shareholders of corporate general partners liable to limited* partners for breach of fiduciary duty. *See In re Estate of Hall,* 517 Pa. 115, 535 A.2d 47, 54 (1987). Therefore, the Damson Limited Partners who owned investment units in Damson 1985–1 and Damson 1985E–1 do not have standing to bring a cause of action for breach of fiduciary duty against the DOC Defendants under Pennsylvania law, and this claim must be dismissed.

### 2. The PPPC Defendants

■ The Damson Limited Partners have failed to state a cause of action against the PPPC Defendants on the theory of breach of fiduciary duty. While the Amended Complaint alleges liability as a result of certain indemnification agreements in which Parker & Parsley agreed to indemnify the DOC Defendants against claims arising out of the Transaction, these agreements do not give the Plaintiffs standing to bring this claim. The Plaintiffs fail to provide any authority to support the proposition that they have standing to bring such a claim against the PPPC Defendants. Instead, they assert policy reasons that it would work judicial inefficiency if this claim were dismissed.

The Damson Limited Partners correctly assert that potentially it would require two trials in order to recover against the PPPC Defendants on this claim. However, this inefficiency is neither inevitable nor necessary because the DOC Defendants could implead the PPPC Defendants as third-party defendants pursuant to Rule 14, Fed. R.Civ.P., and the DOC Defendants have a genuine interest in doing so. The policy concerns raised by the Plaintiffs are adequately addressed through the procedural mechanism of third-party practice under Rule 14. While this procedure remains

within the discretion of the DOC Defendants, the Plaintiffs have provided no justification for this Court to intervene and circumvent the Rule 14 mechanism.

### B. Negligent Misrepresentation

■ "Under New York law, plaintiffs may not sue for negligent misrepresentation unless they are in some kind of privity or similar relationship with defendants. Foreseeable reliance on the misrepresentations is not enough." *Crazy Eddie,* 702 F.Supp. at 982. *See also Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551–53, 493 N.Y.S.2d 435, 443–44, 483 N.E.2d 110, 118 (1985); *White v. Guarente,* 43 N.Y.2d 356, 361, 401 N.Y.S.2d 474, 477, 372 N.E.2d 315, 318 (1977).

According to the allegations of the Amended Complaint, the Damson Limited Partners had just the sort of special relationship with the PPPC Defendants, as statutory sellers pursuant to § 12(2) of the 1933 Act, as well as the DOC Defendants, which gives rise to liability for negligent misrepresentation.

Therefore, the Damson Limited Partners claims alleging negligent misrepresentation by both the PPPC and DOC Defendants are sufficient, and the Defendants' motions to dismiss these claims are denied.

### C. Common Law Fraud

■ In light of the sufficiency of the Plaintiffs' statutory allegations of common law fraud against the PPPC and DOC Defendants, the motions to dismiss the pendant state common law claim for fraud based on these same allegations are denied. Similarly, because the statutory fraud allegations against Smith Barney are insufficient, the pendant state common law claim for fraud based on these same allegations also are dismissed.[13]

### *Conclusion*

For the foregoing reasons, Smith Barney's motion to dismiss all claims against it is granted; the DOC and PPPC Defendants' motions to dismiss the claims brought pursuant to the 1933 and 1934 Acts are denied; the PPPC Defendants' motion to dismiss the pendant state law claim for breach of fiduciary duty is granted; the PPPC Defendants' motions to dismiss the pendant state law claims for negligent misrepresentation and fraud are denied; the DOC Defendants' motions to dismiss the pendant state law claims for breach of fiduciary duty is granted as to those Damson Limited Partners who owned investment units in Damson 1985–1 and Damson 1985E–1, and is denied as to those Damson Limited Partners who owned investment units in Damson Energy, Damson Income, and Damson Institutional; and the DOC Defendants' motions to dismiss the pendent state law claims for negligent misrepresentation and fraud are denied.

It is so ordered.

---

13. Again, this is the only pendent state law claim clearly asserted by the Plaintiffs against Smith Barney. Thus, all implicit state law claims against Smith Barney are also dismissed.